UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

PATRICIA BALABAN,

      Plaintiff,

v.                              Case No:  2:23-cv-379-JES-NPM

BILL PRUMMELL, as Sheriff of
Charlotte County, Florida,

      Defendant.

_____

## OPINION AND ORDER

      This matter comes before the Court on review of Defendant's Motion for Summary Judgment (Doc. #53) filed on August 1, 2025. Plaintiff Patricia Balaban filed a Response in Opposition to the Motion for Summary Judgment (Doc. #65) on September 5, 2025. Defendant filed a Reply on September 15, 2025 (Doc. #66).  For the reasons set forth below, Defendant's motion is granted.

**I.**

      Summary judgment is appropriate only when a movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine issue of material fact exists when the evidence is such that a reasonable trier of fact could return a verdict for the non-moving party.  McCreight v. AuburnBank, 117 F.4th 1322,

1329 (11th Cir. 2024) (citation omitted).  A fact is "material" if it may affect the outcome of the suit under governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In ruling on a motion for summary judgment, a court views all evidence and draws all reasonable inferences in favor of the non-moving party.  Scott v. Harris, 550 U.S. 372, 378 (2007); Tana v. Dantanna's, 611 F.3d 767, 772 (11th Cir. 2010).  While it has not always been so, "the summary judgment rule applies in job discrimination cases just as in other cases." Chapman v. AI Transp., 229 F.3d 1012, 1026 (11th Cir. 2000) (en banc).  An employee may prove discrimination or retaliation with direct or circumstantial evidence.  Desert Palace, Inc. v. Costa, 539 U.S. 90, 99 (2003); Jefferson v. Sewon Am., Inc., 891 F.3d 911, 921 (11th Cir. 2018).  An employee opposing summary judgment with circumstantial evidence must present enough to create a triable issue of material fact.  Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011).  A triable issue exists where the evidence, viewed in the light most favorable to the employee, would allow a reasonable jury to infer that the employer has engaged in intentional discrimination or retaliation.  Lewis v. City of Union City, 934 F.3d 1169, 1185 (11th Cir. 2019).

**II.**

Unless otherwise stated, the following material facts are derived from the uncontested portions of Plaintiff's Third Amended Complaint (the operative pleading) (Doc. #35), Defendant's Motion for Summary Judgment (Doc. #53), and Plaintiff's Response (Doc. #65).

Plaintiff Patricia Balaban (Plaintiff or Balaban) was employed by Defendant Bill Prummell (Defendant or the Sheriff) as a Deputy Sheriff for the Charlotte County Sheriff's Office ("CCSO") from July 1, 2019, until her employment was terminated on February 15, 2022. (Doc. #35, ¶ 3, Doc. #53, ¶ 2.)

In May 2020, Plaintiff began a consensual sexual relationship with Brandon Winters ("Winters"), a law enforcement officer employed by the City of Fort Myers Police Department ("FMPD"). (Doc. #53, ¶ 4.) Plaintiff asserts she had sexual encounters with Winters at her residence on three occasions: May 16, May 29, and June 23, 2020. (Id., ¶ 5.)[1] Text messages between Plaintiff and Winters preceded or followed each encounter. (Id.) Even though Plaintiff herself was off duty during all the encounters, having sex with another law enforcement officer while that officer is on

_____

[1] As the Sheriff notes, a text message by Plaintiff suggests there was an additional sexual encounter before May 16, 2020. (Doc. #53, p. 3 n.2.) The number of sexual encounters is not material to any issue in this case.

duty is considered "conduct unbecoming" an officer under CCSO's internal policies. (Doc. #53, ¶¶ 10-12.)

In September 2020, Plaintiff ended her relationship with Winters. (Doc. #35, ¶ 6; Doc. #53, ¶ 6.) Thereafter Winters "began to stalk and harass [Plaintiff]" (Doc. #35, ¶¶ 7-9) and refused Plaintiff's requests to stop. (Id., ¶ 10.) In May 2021 Plaintiff reported Winters' harassment to the FMPD, which investigated her complaint. (Id., ¶¶ 7, 10-11.) The FMPD placed Winters on administrative leave and concluded its investigation in December 2021. (Id. ¶ 11.) On or about December 21, 2021, Winters' employment with the FMPD was terminated because of his activities involving Plaintiff. (Doc #35, ¶ 11.)

On December 13, 2021, FMPD's Internal Affairs Bureau informed CCSO's Internal Affairs Bureau that it had completed its investigation, and that Plaintiff had admitted to having sex with Winters knowing Winters was then on duty. (Doc. #53, ¶¶ 9-10.) CCSO Sgt. [now-Lieutenant] Nikki Wagner ("Sgt. Wagner") obtained a copy of the FMPD investigative file, which included text messages between Plaintiff and Winters. (Id., ¶¶ 14, 15.) On December 13, 2021, Plaintiff was notified in writing that a complaint had been filed against her which was being investigated by the CCSO Internal Affairs Unit. (Id., ¶ 15.) The complaint alleged that Plaintiff's "actions with an on-duty Fort Myers Police Department officer

brought [the CCSO] into disrepute, reflected discredit upon or impaired the operation and efficiency of [the CCSO]." (Id.)

The FMPD investigative file included the following text messages:

- On May 14, 2020, Plaintiff texted Winters stating "Damn, we only had sex once. Jeeze." (Doc. #53, p. 3, n.2.)

- On May 16, 2020, Winters advised Plaintiff by text message that his shift ended at 11:00 p.m. Winters arrived at Plaintiff's residence around 8:00 p.m. in a patrol car, entered the residence, and performed oral sex on Plaintiff. (Id., ¶ 16.)

- On May 28, 2020, Plaintiff sent texts to Winters stating, among other things, "You don't come over **unless you're working** and I'm home[]." (Id., ¶ 18) (emphasis in original).

- On May 29, 2020, Winters informed Plaintiff that he was on "off duty detail" from 7:00 p.m. to 11:00 p.m. (Id., ¶ 19.) Plaintiff understood that an "off duty detail" was still considered "on duty" for an officer. (Id.) Winters arrived at Plaintiff's home at 10:41 p.m., they engaged in a sexual encounter, and Winters left at 10:56 p.m. (Doc. #65, ¶ 19.)

Plaintiff and Winters' final sexual encounter at Plaintiff's residence was on June 23, 2020.  Winters accidentally left police equipment ("keepers") in Plaintiff's residence.  Keepers are equipment issued to officers to help keep their gun belt/equipment in place and are worn only while on duty.  (Doc. #53, ¶ 20.)

On each occasion of a sexual encounter Winters had arrived at Plaintiff's residence in uniform and with his police radio active. (Id., ¶ 21.)  On one occasion Winters put himself in an "area check" during the encounter, which is only applicable when an officer is on active duty.  (Id., ¶ 22.)

On December 30, 2021, Sgt. Wagner interviewed Plaintiff regarding the misconduct allegation.  (Id., ¶ 26.)  During the interview, Plaintiff confirmed that she understood the reason for the investigation was that she had sex with Winters while he was on duty.  (Id., ¶ 28.)  Sgt. Wagner asked whether Plaintiff knew that Winters was on duty when they had sexual intercourse, and Plaintiff gave the following answer:

> DEPUTY BALABAN: I do not know.  He came in
> with his body camera off. He said prior to us
> -- prior to us having any sort of physical
> relationship, okay, he said, I'm gonna put
> myself on a area check, blah, blah, blah,
> nobody's gonna be the wiser and I -- and I
> told him, I'm like you're dumb, that's --
> you're gonna get in trouble and you're gonna
> get fired for that.  That's dumb.  You know,
> don't do it.  There was a -- first time that
> he came over to my apartment he did have his

body camera on.  At that point I didn't know
what their body camera rules are or what not
and I got freaked out and I'm like, what the
hell dude, you know. The second two times that
we actually did have intercourse at, you know,
my house, he didn't have his body camera on,
so I'm thinking, well I don't know, maybe, you
know, they have the same rules as other
agencies that I know of that you have to dock,
you know, the -- the camera every single
shift. I didn't know. There was another time
he came over, and he got a call for service,
and I was like what the hell are you doing?
You know, we didn't have sex that day and I'm
like, what're you doing? Like, get the hell
outta my house. Like, this is ridiculous. Like
are you serious right now?

(Doc. #56-4, p. 9.)  Sgt. Wagner pressed the issue for a clearer

answer, resulting in the following exchange:

INTERVIEWER: So, you're trying to tell me that
you – the times that you had intercourse or
oral with him, you did not know –

DEPUTY BALABAN: The first time –

INTERVIEWER: That he was on duty.

DEPUTY BALABAN: The first time –

INTERVIEWER: Remember I have your statements.

DEPUTY BALABAN: Mm Hm. The first time, he – he
might've been on duty.

INTERVIEWER: And your text messages too.

DEPUTY BALABAN: Mm Hm.

INTERVIEWER: So I'm gonna ask you one more
time –

DEPUTY BALABAN: Mm Hm

INTERVIEWER: Did you know that he was on duty
when he had sex?  When you had sex with him or
oral.

DEPUTY BALABAN: The oral, I wanna say yes.

INTERVIEWER: You did know.

DEPUTY BALABAN: Mm Hm.

INTERVIEWER: Is that a yes?

DEPUTY BALABAN: Yes.

INTERVIEWER: And the other two times that you had sex with him –

DEPUTY BALABAN: Did I know for 100% fact –

INTERVIEWER: And I also – yes, did you?

DEPUTY BALABAN: 100% fact, no, I didn't.   I can't say that – that I did.   I mean, he could've –

INTERVIEWER: Deputy Balaban –

DEPUTY BALABAN: Yes.

INTERVIEWER: I also have your text messages with him.

DEPUTY BALABAN: Mm Hm.

INTERVIEWER: So again, I'm gonna ask you one more time on that.   Did you know he was on duty when you had sexual intercourse with him?

DEPUTY BALABAN: Yes.

(Doc. #56-4, pp. 9-11.)  Before Sgt. Wagner concluded the interview she asked Plaintiff: "So do you have anything before I conclude your statement that you want to say? Or anything that you want to delete, correct anything?"  Plaintiff responded: "Not from what I've told you."  (Doc. #56-4, p. 21.)

Following her investigation, Sgt. Wagner recommended that the CCSO issue Plaintiff a "Conduct Unbecoming" violation for sexual encounters with Winters while he was on duty. As a matter of practice Sgt. Wagner did not add any policy violations beyond what

she had been charged to investigate. Nonetheless, Sgt. Wagner believed Plaintiff had lied to her during the interview, documented Plaintiff's untruthfulness in her report, deferred to her chain of command, and expected Plaintiff to be dismissed from her employment with CCSO as a result.  (Doc. #53 at ¶ 33.)

When an internal investigation results in a sustained policy violation, the investigative file is routed through the officer's chain of command for disciplinary recommendations before it reaches the Sheriff for a final decision.  (Doc. #53 at ¶ 34.) Each of the three officers in the chain of command review process recommended either suspension or dismissal on the conduct unbecoming charge.  All reviewing officers deferred to the Sheriff the decision of whether to add an untruthfulness charge. (Id., ¶¶ 36-37.)

After the Sheriff reviewed the file, including the audio-recording of Plaintiff's interview with Sgt. Wagner, he determined that Plaintiff had been untruthful based on her attempts to deny knowledge that Winters was on duty during their sexual encounters. (Id., ¶38.)  The Sheriff therefore added a sustained untruthfulness violation to the report and made the initial decision to withdraw Plaintiff's appointment with CCSO.  (Id.)

On February 7, 2022, Plaintiff was notified of the sustained violation for conduct unbecoming and untruthfulness, and was

placed on administrative leave with pay. (Doc. #35, ¶ 17; Doc. #53, ¶ 40.)

Plaintiff attended a pre-disciplinary hearing on February 14, 2022. (Doc. #53, ¶ 41.) The Sheriff explained to Plaintiff that her conduct unbecoming offense, while wrong, "was very survivable" but expressed concern with "the fact that [she] tried to lie to Sergeant Wagner." (Doc. #57-3 at pp. 2-9.) Plaintiff stated that she was only "trying to explain herself" during that portion of the interview and that Sgt. Wagner had "cut [her] off" before she had a chance to explain herself. (Id.).

After the pre-disciplinary hearing the Sheriff re-listened to the investigatory interview and determined that Plaintiff's claim that she was not given an opportunity to explain herself lacked merit. (Doc. #53, ¶ 45.) Accordingly, the Sheriff decided to proceed with the withdrawal of Plaintiff's appointment. (Id.)

On February 15, 2022, the Sheriff informed Plaintiff in writing (Doc. #35, ¶ 18) and by telephone that her employment was withdrawn effective immediately. (Doc. #53, ¶ 46.) During the phone conversation, the Sheriff told Plaintiff that "he and the command staff had lost trust in her ability to remain a CCSO deputy." (Doc. #53, ¶¶ 45-46.)

## III.

Plaintiff's Third Amended Complaint (TAC) (Doc. #35) alleges two claims against the Sheriff in his official capacity based on the termination of Plaintiff's employment with CCSO. Count I alleges a claim pursuant to 42 U.S.C. § 1983 for violation of the Fourteenth Amendment Equal Protection Clause. (Id., ¶¶ 27-29.) Count I asserts that Plaintiff "was treated differently as to the discipline imposed upon her than similarly situated males." (Id., ¶ 28.) Count I incorporates assertions that Plaintiff "was terminated . . . because of her sex" and "would have been treated substantially and materially different had she been a male" (Id., ¶ 22), and that "Plaintiff's termination was inconsistent with and significantly departed from the punishments previously imposed for conduct of similar magnitude against males." (Id., ¶ 24.)

Count II alleges a claim pursuant to § 1983 for violation of Plaintiff's free speech rights under the First Amendment. (Id., ¶¶ 30-32.) Count II alleges that "in investigating and ultimately terminating Plaintiff, PRUMMELL was retaliating against Plaintiff for exercising her right to report the misconduct of the Fort Myers Police Department and the reporting of a crime against her, . . .." (Id., ¶ 31.) Count II incorporates language which alleges that the investigation was to punish "Plaintiff for exercising her

First Amendment right to report the misconduct of the Fort Myers Police Department" (Id., ¶ 23).[2]

The Sheriff seeks summary judgment on three grounds: (1) Plaintiff cannot establish a prima facie case of gender discrimination because there is a lack of comparator evidence (Doc. #53, pp. 13-15); (2) Plaintiff's First Amendment retaliation claim fails for lack of causation (Id., pp. 16-17); and (3) both claims fail because Plaintiff's employment was terminated for a legitimate, non-pretextual reason. (Id., pp. 18-22.) The Court will consider each of the TAC's claims in turn.

### A. Count I: Equal Protection Claim

#### (1)    General Principles

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1, cl. 4. This is "essentially a direction that all persons similarly situated should be treated alike," and "simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." Adams by & through

---

[2] Plaintiff previously sued Winters and the City of Fort Myers in federal court. Three complaints were dismissed without prejudice, and Plaintiff declined the opportunity to file a fourth complaint against those defendants. Balaban v. Winters and City of Fort Myers, Case No. 2:23-cv-12.

Kasper v. Sch. Bd. of St. Johns Cnty., 57 F.4th 791, 800-01 (11th Cir. 2022) (citations omitted.)  In short, "[t]he Equal Protection Clause requires that the government treat similarly situated persons in a similar manner." Gary v. City of Warner Robins, Ga., 311 F.3d 1334, 1337 (11th Cir. 2002).

In a traditional employment claim brought under the Equal Protection Clause, an employee claims that he or she was discriminated against on account of membership in an identifiable or constitutionally protected class, like race, religion, sex, or national origin.  In such a claim a comparator is generally needed since the very nature of equal protection requires comparison of plaintiff to someone else or to some class.  For example, United States v. Armstrong, 517 U.S. 456, 465 (1996) held that a plaintiff alleging a claim of selective prosecution in violation of the Equal Protection Clause must plead and establish the existence of similarly situated individuals who were not prosecuted.

It is well-settled that the Equal Protection Clause prohibits sex discrimination in public employment, Hornsby-Culpepper v. Ware, 906 F.3d 1302, 1312 (11th Cir. 2018), and that gender is a suspect class entitled to heightened judicial scrutiny.  Corbitt v. Sec'y of the Alabama Law Enf't Agency, 115 F.4th 1335, 1345 (11th Cir. 2024); Doe v. Moore, 410 F.3d 1337, 1346 (11th Cir. 2005).  To prevail on her equal protection claim, Plaintiff must

show (1) she was similarly situated to other deputies who received more favorable treatment; and (2) the Sheriff engaged in invidious discrimination against her based on her gender. Sumrall v. Georgia Dep't of Corr., 154 F.4th 1304, 1312 (11th Cir. 2025). To establish a "similarly situated" individual, Plaintiff must show that she and her comparators are "similarly situated in all material respects." Lewis v. City of Union City, Georgia, 918 F.3d 1213, 1224 (11th Cir. 2019)(en banc). In the context of government employment, a plaintiff must show discrimination based on a suspect classification because the "class-of-one theory of equal protection has no application in the public employment context." Engquist v. Oregon Dept. of Agr., 553 U.S. 591, 607 (2008).

An employee may establish her case using direct or circumstantial evidence, or a combination of both. Jefferson v. Sewon Am. Inc., 891 F.3d 911, 921 (11th Cir. 2018). Employment discrimination claims brought under the Equal Protection Clause are "subject to the same standards of proof and use the same analytical framework" as statutory employment discrimination claims. Hornsby-Culpepper, 906 F.3d at 1312 n.6; Bryant v. Jones, 575 F.3d 1281, 1296 n.20 (11th Cir. 2009). When utilizing circumstantial evidence, a plaintiff may rely on the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green,

411 U.S. 792 (1973), or establish a "convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1327-28 (11th Cir. 2011) (internal quotation marks omitted) (footnote omitted). See also Lewis, 918 F.3d at 1220 n.5; Lewis v. City of Union City, 934 F.3d 1169, 1185 (11th.Cir. 2019); Berry v. Crestwood Healthcare LP, 84 F.4th 1300, 1311 (11th Cir. 2023); Ismael v. Roundtree, 161 F.4th 752, 759 (11th Cir. 2025).

### (2)  Application of Equal Protection Principles

The Sheriff argues that the three-step burden-shifting framework of McDonnell Douglas applies to Plaintiff's equal protection claim, requiring Plaintiff to establish a *prima facie* case of discrimination by showing that (1) she belongs to a protected class, (2) she was subjected to an adverse employment action, (3) she was qualified to perform the job in question, and (4) her employer treated "similarly situated" employees outside her class more favorably. See Lewis, 918 F.3d at 1220-21. The Sheriff argues that Plaintiff has not established a *prima facie* case because there are no legally viable comparators who are "similarly situated in all material respects," the standard required by Lewis, 918 F.3d at 1226 ("we hold that a plaintiff proceeding under McDonnell Douglas must show that she and her

comparators are 'similarly situated in all material respects.'")
For this reason, the Sheriff argues, he is entitled to summary
judgment as to Count I.  (Doc. #53, pp. 13-15.)

McDonnell Douglas does apply to this case, and part of its
*prima facie* case requirement is the showing of a similarly situated
comparator.  A comparator requirement makes sense given the nature
of a selective-enforcement claim such as this.  The issue is
whether the plaintiff was unfairly targeted for enhanced
discipline because of her gender, not whether the reasons offered
for the official action were valid or genuine. See Schwarz v. City
of Treasure Island, 544 F.3d 1201, 1216 (11th Cir. 2008).
Establishing a discriminatory effect necessarily requires a more
direct comparison to others, because "[w]ith selective-enforcement
claims like this, evenhanded application of the law is the end of
the matter." Id. at 1217.

Plaintiff has clearly stated an equal protection claim which
requires her to establish similarly situated male comparators.
The TAC (Doc. #35) asserts that Plaintiff "was treated differently
as to the discipline imposed upon her than similarly situated
males."  (Id., ¶ 28.)  Count I incorporates assertions that
Plaintiff "was terminated . . . because of her sex" and "would
have been treated substantially and materially different had she
been a male" (Id., ¶ 22), and that "Plaintiff's termination was

-16-

inconsistent with and significantly departed from the punishments previously imposed for conduct of similar magnitude against males." (Id., ¶ 24.)

Plaintiff identifies four comparators (David Motz, Kevin Ostrowsky, David Imbruno, and Timothy Degrasse). Each had sustained "conduct unbecoming" violations with the CCSO but were not terminated from employment. None of the four comparators proffered by Plaintiff engaged in the same type of misconduct as Plaintiff, and none had violated a CCSO policy regarding untruthfulness. As Defendant points out, the record establishes that every person who has been found to have violated CCSO's untruthfulness policy has had their employment withdrawn or resigned in lieu of termination. Thus, Plaintiff has not shown any valid comparators.

Plaintiff argues she was not disciplined for a lack of truthfulness, so there is no need for an untruthfulness characteristic to be present in any of the comparators. Plaintiff asserts that "[n]o reasonable reading of [Plaintiff's investigatory interview] would lead to the finding that she violated the 'untruthfulness' general order that [Defendant] has outlined." (Doc. #65, p. 11-12.)

But the record is clear that Plaintiff's employment was terminated because the Sheriff concluded she had been untruthful

in her interview.  While Plaintiff disagrees with the merits of
this finding, there is no evidence showing that the stated reason
was both false and that discrimination [or retaliation] was the
real reason for the adverse action.  If "the proffered reason is
one that might motivate a reasonable employer, [a] [plaintiff]
must meet that reason head on and rebut it, and the [plaintiff]
cannot succeed by simply quarreling with the wisdom of that
reason." Chapman v. AI Transp., 229 F.3d 1012, 1030 (11th Cir.
2000).

Untruthfulness was specifically raised during Plaintiff's
pre-termination hearing when the Sheriff explained that, although
Plaintiff's "conduct unbecoming" charge, on its own, "was very
survivable[,]" "the fact that [Plaintiff] tried to lie to Sgt.
Wagner" during her investigatory interview was the issue
warranting dismissal.  Plaintiff was given an opportunity to
disagree with Defendant concerning her dishonesty violation during
that interview, and Defendant agreed to re-listen to the
investigatory interview based on Plaintiff's representations.
After the hearing, Defendant re-listened to the investigatory
interview and determined that Plaintiff's claim that she had not
had an opportunity to explain herself lacked merit.  Accordingly,
he moved forward with his decision to withdraw Plaintiff's
appointment.  Plaintiff's disagreement with the wisdom behind

Defendant's decision to terminate her employment because of her dishonesty during the investigatory interview is insufficient to either show the comparators were similarly situated or that the reason for termination of employment was pretextual. Allegations which fail to provide details that would allow the Court to assess whether others were similarly situated are simply conclusory allegations which are not enough to create a genuine dispute of material fact. Sumrall v. Georgia Dep't of Corr., 154 F.4th 1304, 1313 (11th Cir. 2025); Evers v. Gen. Motors Corp., 770 F.2d 984, 986 (11th Cir. 1985).

Plaintiff responds by arguing that "[f]ederal courts have recognized that comparator evidence is not an essential element for establishing a gender discrimination claim." (Doc. #65, p. 7.) E.g., Ballou v. McElvain, 29 F.4th 413, 426 (9th Cir. 2022) ("comparator evidence in disparate treatment claims can, but need not, be used to support a finding of a discriminatory motive. It is not a gatekeeping mechanism essential to plaintiffs' ability to prove that they have been denied equal protection of the laws by being adversely treated on the basis of membership in a protected class.")

It is certainly true that the McDonnell Douglas framework "is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment

discrimination case." Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011).  Even without similarly situated comparators "the plaintiff will always survive summary judgment if [s]he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." Lewis, 934 F.3d at 1185 (quoting Lockheed-Martin Corp., 644 F.3d at 1328.) Accordingly, a plaintiff may defeat a summary judgment motion by presenting a "convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." Id. (quotation and citation omitted).  Plaintiff has not done so in this case.

Plaintiff cites various facts which she claims establish a basis to reasonably infer disparate treatment and pretext in violation of the Equal Protection Clause of the Fourteenth Amendment.  These include (1) Defendant's decision to add the additional untruthfulness violation "to obfuscate the fact that [Plaintiff] was fired for conduct that similarly situated male officers were lightly punished for[,]" (2) the fact that Defendant imposed "the harshest possible punishment based on lawful, consensual conduct," in comparison to "male officers who had committed duty-related and much more egregious offenses" (e.g. having sexual relations with a domestic violence victim in a case against the perpetrator husband and accessing pornography during

work duty as a school resource officer), and (3) the fact that the disciplinary action was taken only after "salacious news reports" about Plaintiff and Winters surfaced.  (Doc. #66, pp. 11-15.)

The Court's function at this stage of the proceedings does not include weighing whether the evidence is sufficient to prove plaintiff's case.  Instead, the Court must ask whether Plaintiff has presented the requisite "convincing mosaic" of evidence to allow a reasonable jury to infer that bias against Plaintiff's protected characteristic (here, sex) was either the true reason or a motivating factor for her discharge.  See Quigg v. Thomas Cnty. Sch. Dist., 814 F.3d 1227, 1235 (11th Cir. 2016).

The Court finds that Plaintiff has not presented sufficient evidence to allow a reasonable jury to infer that Defendant's bias against Plaintiff's sex was either the true reason or a motivating factor for her discharge.  The evidence shows that Plaintiff was dismissed from duties as a Sheriff's Deputy with CCSO as a result of untruthfulness about her sexual relationship with Winters,  not, as Plaintiff suggests, her protected characteristics under the Equal Protection Clause of the Fourteenth Amendment.  Accordingly, Plaintiff has not presented sufficient evidence to survive summary judgment as to her Equal Protection claim against Defendant and judgment is entered in favor of Defendant on Count I.

Even if Plaintiff had met her burden as to similarly situated males, she has not presented evidence that the Sheriff acted with a discriminatory purpose. To "make out an equal protection claim, a plaintiff must prove purposeful, intentional discrimination." Morrissey v. United States, 871 F.3d 1260, 1271 (11th Cir. 2017). Sumrall, 154 F.4th at 1313. Other than her disagreement with the merits of the Sheriff's untruthfulness finding, Plaintiff has presented no evidence which would allow a reasonable jury to make such a finding.

### B. First Amendment Retaliation

Count II of the operative pleading alleges that Plaintiff engaged in constitutionally protected activity when she reported Winters to FMPD for harassing and stalking her. Plaintiff asserts that the subsequent disciplinary investigation against her and her ultimate discharge from employment was in retaliation for that protected activity, in violation of the First Amendment. (Doc. #35, ¶¶ 31, 32.)

The Eleventh Circuit has set out three requirements to state a claim for retaliation under the First Amendment:

> (1) [the plaintiff] engaged in constitutionally protected speech, . . . ; (2) the defendant's retaliatory conduct adversely affected that protected speech . . . ; and (3) a causal connection exists between the defendant's retaliatory conduct and the

adverse effect on the plaintiff's speech . . . .

DeMartini v. Town of Gulf Stream, 942 F.3d 1277, 1289 (11th Cir. 2019). Defendant does not challenge that Plaintiff's report to FMPD regarding Winters constituted protected First Amendment Speech. Nor does he challenge whether the retaliatory conduct (here, Plaintiff's termination from employment) "would likely deter a person of ordinary firmness from the exercise of First Amendment rights." Bailey v. Wheeler, 843 F.3d 473, 481 (11th Cir. 2016) (citation omitted). Instead, Defendant argues that Plaintiff has failed to establish that her report to FMPD was the "but-for" cause of the adverse employment action.

Defendant is correct that to satisfy the causation element, Plaintiff must show that her speech was a but-for cause of Defendant's adverse action against her. Nieves v. Bartlett, 587 U.S. 391, 399 (2019). More specifically, "[i]n order to establish a causal connection, the plaintiff must show that the defendant was subjectively motivated to take the adverse action because of the protected speech." Castle v. Appalachian Tech. College, 631 F.3d 1194, 1197 (11th Cir. 2011) (citing Smith v. Moseley, 532 F.3d 1270, 1278 (11th Cir. 2008)). But "[b]ecause producing direct evidence of an official's inner motivations is often not possible, [courts may rely] on circumstantial evidence to establish the

causal link." Huggins v. Sch. Dist. of Manatee Cnty., 151 F.4th 1268, 1282 (11th Cir. 2025).

Plaintiff has not presented sufficient circumstantial evidence to support causation. Plaintiff reported Winters to FMPD on May 27, 2021. CCSO did not begin its investigation of Plaintiff until December 2021, (Doc. #35, ¶ 26), when FMPD's Internal Affairs Bureau informed CCSO's Internal Affairs Bureau that it had completed its investigation, and that Plaintiff had admitted to having sex with Winters knowing Winters was then on duty. (Doc. #53, ¶¶ 9-10.) A gap of seven months between the protected speech and adverse employment action, by itself, is far too long to allow a reasonable inference of causation. See Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001) ("temporal proximity must be 'very close'" to provide sufficient evidence of causality (citation omitted)); Gilliam v. U.S. Dep't of Veterans Affairs, 822 Fed. Appx. 985, 987 (11th Cir. 2020) (three-month gap is not close enough); Thibodeaux v. City of Atlanta, Georgia, No. 24-12921, 2025 WL 2505600, at *4 (11th Cir. Sept. 2, 2025) (no temporal evidence of causation where termination occurred "18 months after [plaintiff's] written complaint alleging sexual harassment, 6 months after her second demand letter to the city, and 4 months after her EEOC filing.").

Plaintiff nevertheless maintains that a reasonable jury could infer that she was terminated in retaliation for reporting Winters to FMPD because various "embarrassing" news reports made public the details of her sexual relationship with Winters, including an article published in December 2021, when CCSO began its investigation of Plaintiff. (Doc. #35, ¶ 26.) According to Plaintiff, a reasonable inference can be made that she was terminated due to these embarrassing news articles. (Doc. #65, p. 14.) But Plaintiff presents no evidence to permit such an inference, particularly in light of the Sheriff's uncontradicted deposition testimony that he was unaware of the public news reports surrounding Plaintiff and Winters' relationship at the time that Plaintiff was terminated (Doc. #63-1, p. 17).

"To survive summary judgment, the employee must present a story, supported by evidence, that would allow a reasonable jury to find that the employer engaged in unlawful retaliation against the employee." Berry v. Crestwood Healthcare LP, 84 F.4th 1300, 1311 (11th Cir. 2023) (citing Lewis, 934 F.3d at 1185). Without any other evidence showing that Sheriff Prummell was embarrassed because of the conduct of another police department's law enforcement officer in a different county, Plaintiff has failed to create a triable issue of fact as to the causation element for her

retaliation claim. The motion is therefore granted as to Count II.

Accordingly, it is now

**ORDERED:**

Defendant's Motion for Summary Judgment (Doc. #53) is **GRANTED** as to Count I and Count II of the Complaint. Judgment will be entered in favor of Defendant Bill Prummell, as Sheriff of Charlotte County, Florida, and against Plaintiff Patricia Balaban, who shall take nothing as to these counts.

**DONE AND ORDERED** at Fort Myers, Florida, this ___5th___ day of January 2026.

JOHN E. STEELE
SENIOR UNITED STATES DISTRICT JUDGE

Copies:
Parties of record